OPINION
Appellant presents two assignments of error for consideration that are:
"FIRST ASSIGNMENT OF ERROR
 THE CONVICTION OF THE DEFENDANT FOR AGGRAVATED ROBBERY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE STATE FAILED TO PRODUCE ANY EVIDENCE THAT THE DEFENDANT COMMITTED AND/OR ATTEMPTED TO COMMIT A THEFT OFFENSE
"SECOND ASSIGNMENT OF ERROR
 THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED THE APPELLANT'S MOTION TO SUPPRESS BECAUSE THE PRETRIAL IDENTIFICATION BY PHOTOGRAPH WAS IMPERMISSIBLY SUGGESTIVE GIVING RISE TO A SUBSTANTIAL LIKELIHOOD OF MISIDENTIFICATION"
In support of his first assignment of error, appellant argues that his conviction for aggravated robbery is against the manifest weight of the evidence. He says there is nothing to "convincingly demonstrate" that he took or attempted to take control over someone else's property with the purpose to deprive that person of the property.
The Supreme Court of Ohio has said:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' * * *
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
Keeping this standard in mind, we review the elements of aggra vated robbery that the state was required to prove beyond a reasonable doubt in this case.
Appellant was charged with aggravated robbery, which is defined in R.C. 2911.01(A)(1). R.C. 2911.01(A)(1) provides:
 "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *."
Theft, which is referred to as an element of aggravated robbery, is defined as follows in R.C. 2913.02:
 "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
"* * *
"(4) By threat."
Finally, attempt is defined in R.C. 2923.02, which reads:
 "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
Two cashiers who worked at the Speedway store located at the corner of Detroit and Arlington streets in Toledo, Ohio on November 2, 1997 at 9:15 p.m. testified at trial. The first cashier to testify said that at the time in question she was in the back of the store, stacking two liter crates behind a cooler containing pop, when she saw appellant walk past the window. She said she saw the left side of his face, and noticed a tattoo on his cheek near his eye. She thought the tattoo was shaped like a teardrop. She had seen appellant at the store before. When he walked past the window, he was headed toward the entrance of the store. She did not leave the back of the store, however, and did not see appellant come into the store.
The second cashier to testify said she was waiting on a woman customer when appellant walked into the store. Because part of her job is to watch customers, she focused on appellant after the woman customer left the store and went outside to pump gasoline into her vehicle. She saw appellant go to the back of the store and put a cheeseburger in the microwave.
The second cashier said she had been eating an ice cream bar that was beginning to melt. She went to one of the aisles in the store to get a napkin. When she reached the end of the aisle, she saw appellant trying to pull a mask or a hair net over his face. She said he saw her looking at him, pulled a black handgun from the waist of his pants, pointed it at her and yelled that she had better not run. She said she did run. She ran out the door. She tripped and fell in the parking lot, hurting her knees and elbows. She ran to the woman customer who was pumping gas and told her a man was trying to rob the store. The woman customer panicked, got into her van and drove away.
The second cashier said that when she ran out the door, appellant ran out right behind her. He turned, and ran around the back of the building. After the woman customer left, the second cashier ran, screaming, back into the store. Following store policy, she locked the door and told her co-worker to call 911. The co-worker dialed the phone and handed it to the second cashier so she could report the robbery. The co-worker then went to a second phone and called their supervisor to report the attempted robbery.
A police officer arrived as a result of the call to 911. He interviewed the two cashiers and a male customer who was pumping gas outside the store. The male customer said he saw a man run out the door of the store and around the building to a car that was waiting in the alley. He got in the passenger side of the car, and its driver drove away.
The police officer got a description of the man in the store from the two cashiers. He said: "It was a black male about 5'3" with a tear drop tattoo on his left eye wearing green nylon pants multi-colored shirt, and some type of they said golf hat or beret."
A detective for the Toledo Police Department heard the information about the robbery on his police radio, and went to the store. He talked with the cashiers and the police officer who was already at the scene. The store manager arrived and helped him to get the videotape made by security cameras at the store. He took the videotape to the security department of another store. The people there used their equipment to help him see the video and to make still photos of the frames showing a black male entering the store.
The detective had a photo lineup prepared showing six black males. He showed the photo array to both cashiers at separate times and locations. The cashier who saw appellant walking past the window toward the entrance to the store positively identified appellant's picture. She signed her name on the back of the photo array under his picture.
The second cashier told the detective that appellant's picture looked familiar and she thought he was the one who tried to rob her, but she was not certain. She subsequently made positive identifications of appellant in court, first in a hearing on a motion to suppress the identification drawn from the photo array, and second during the jury trial.
The detective testified, after closely examining appellant at the request of appellant's counsel, that the tattoo on appellant's left cheek was in the shape of a heart, not a teardrop. He also confirmed, as did the two cashiers, that no money or goods were taken from the speedway store by appellant.
Appellant presented two alibi witnesses. The first witness was a good friend of appellant's girlfriend. She testified that appellant's girlfriend drove over and picked her up at her home sometime between 5:30 p.m. and 6:00 p.m. on November 2, 1997. She said they got a bucket of chicken from a fast food restaurant and took it back to the home of appellant's girlfriend.
She said when they got there, she saw appellant and his girlfriend's brother. She said they ate the chicken and played cards for a while. Then, appellant and his girlfriend's brother went into the kitchen to fix a leak under the sink. She went upstairs so appellant's girlfriend could put a permanent in her hair. She said she could hear rap music and could hear appellant and his girlfriend's brother talking above the sound of the music. She said she and appellant's girlfriend were in an upstairs bedroom for about an hour, from 9:00 p.m. to 10:00 p.m., while she got her permanent put into her hair. She admitted on cross-examination that it was possible appellant could have left the house during some of that time and she would not have known.
Appellant's girlfriend testified similarly to her friend. However, she said after she washed her girlfriend's hair in the bathroom upstairs, they came back downstairs. According to her, they were in the dining room downstairs when she put the permanent in her girlfriend's hair. She said they had the radio on and that the music they listened to was a mixture of styles. She said she could see appellant and her brother in the kitchen working on a leak under the sink for an hour starting at 9:00 p.m.
Appellant says the above testimony does not show that the "person who brandished the gun in the Speedway Gas Station" demanded or took any money or merchandise. He also says the testimony did not even show the person tried to take any money or merchandise. He argues: "The only evidence of overt acts by the perpetrator presented at trial was that he covered his face, waved a gun and said `don't run, bitch'. Certainly, this does notconvincingly demonstrate nor does it strongly corroborate that the perpetrator's purpose was to deprive someone else of their property as required by Ohio law."
We are unpersuaded by appellant's argument. His actions of putting a face mask or netting over his face while standing at the back of the store and chasing the second cashier while brandishing a handgun and yelling warnings that she had better not run, convincingly demonstrate and strongly corroborate beyond a reasonable doubt to a reasonable person that he was attempting to take money or possessions from the store. The cashier who saw appellant putting a covering over his face, pull a gun from his waistband and point it toward her while telling her not to run interpreted his actions as steps taken to rob her. She reacted by running from the store and seeking help from the woman outside. She told the woman a man was trying to rob the store. When she called 911 and talked to the police officers who responded to her call, she reported an attempted robbery. The mere failure to make a verbal demand for money or property does not mean the elements of aggravated robbery were not proved. See State v.Bryant (Feb. 3, 1983), Cuyahoga App. No. 45013, unreported. Appellant's first assignment of error is not well-taken.
In support of his second assignment of error, appellant argues that the photo lineup shown to the cashiers by the police detective was impermissibly suggestive, and their identification of him based upon that lineup should have been suppressed. He says the photo lineup was unduly suggestive because four pictures were of persons who had marks, not tattoos under their left eye. Therefore, according to appellant: "The size of the array shown to the witnesses was effectively reduced from six to two because the police failed to include photos of six individuals with tattoos
under their left eye."
As this court has previously said:
 "An appellate court reviews whether substantial evidence supports a trial court's decision on a motion to suppress. Maumee v. Johnson (1993), 90 Ohio App.3d 169, 171. The trial court acts as the trier of fact and is in the best position to resolve questions of fact and determine witness credibility. State v. Johnston (1993), 85 Ohio App.3d 475, 477. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592, 594." State v. Jenkins (Mar. 31, 1998), Lucas App. No. L-97-1303, unreported.
In this case, the trial court correctly noted at the suppression hearing that the defendant had the burden of proving a two-part test. First, the defendant had to show that the photo lineup was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v.United States (1968), 390 U.S. 377, 384. Second, the defendant had to show that the identification of the accused by the eyewitnesses was unreliable when the totality of circumstances surrounding the identification were considered. Some factors to consider regarding reliability include: (1) the length of time the witness was able to see the person who was committing the crime; (2) how attentive the witness was during the crime; (3) the degree of accuracy of the witness's description of the criminal immediately after the crime; (4) how certain the witness was about the identification of the accused; and (5) how much time expired between the time of the crime and the time of the identification.Neil v. Biggers (1972), 409 U.S. 188, 199.
The trial court heard testimony from the two eyewitnesses and from the detective who prepared the photo lineup. The trial court also looked at the photo lineup. The trial court noted that it is undisputed in this case that no suggestion was made to either witness that the suspect was one of the people in the lineup and that the photographs showed no indication that they were made from mugshots. The trial court then said:
 "In looking at the photographs, it appears as if at least three of the individuals in the photographs, number two, number three, and number four, have marks in the area described by the witnesses to Detective Wirth or to other officers. And as I say, three of those six have these marks.
 "In addition, looking at the photographs, it appears, obviously, that the defendants are all of the same race, and that their skin color is similar, allowing for the normal gradations of skin color.
 "The length of their hair, the hairlines and the presence of facial hair is similar. There are mustaches on all six of the defen dants or all six of the persons in the photo graphs.
 "So I'll make a finding based upon my review of the photo spread that photo spread in and of itself is not so impermissibly suggestive as to give rise to the very substantial like lihood of irreputable [sic] misidentification."
We have reviewed the testimony at the hearing on the motion to suppress and the photo lineup. We find that the trial court's findings of fact are supported by competent, credible evidence. We further agree with the legal conclusion of the trial court that the photo lineup is not impermissibly suggestive. Accordingly, we need not consider the second part of the test, reliability. Appellant's second assignment of error is not well-taken.
After reviewing the record and considering the assignment of error presented, we conclude that appellant was not prejudiced or prevented from having a fair trial. Therefore, we affirm the judgment of the Lucas County Court of Common Pleas.
Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
 Peter M. Handwork, P.J.
 Melvin L. Resnick, J.
 James R. Sherck, J.
CONCUR.